### JUSTUS RILEY *against* ROGER RILEY.

MOTION for a new trial.

Letters of administration
granted under
the authority
of another
state, are of no
avail in this.

On the trial of this cause in the *superior court*, it appeared that the plaintiff was a creditor of the estate of *Moses Deming*, late of *New-Hartford* in the state of *New-York*, deceased; and that personal property belonging to

that estate had come to the hands of the defendant, and had been disposed of by him. The plaintiff, therefore, claimed, that the defendant was liable as *executor de son tort.*

The defendant resisted this claim on the ground that he was authorized to receive and dispose of the property in question by *Jedediah Sanger*, to whom letters of administration had been granted, by the surrogate of *Oneida* county, in the state of *New-York;* and offered such letters, duly authenticated, in evidence. The plaintiff objected to their admission, on the ground that letters of administration granted in the state of *New-York* were of no validity in this state, and that the defendant could derive no authority therefrom to receive and dispose of the goods of the deceased. But the court overruled the objection, and admitted the evidence offered; in consequence of which, the issue in the cause was found in favour of the defendant.

On motion of the plaintiff, the court granted a rule to show cause why a new trial should not be had; and reserved the question for the opinion of the nine judges.

*T. S. Williams,* in support of the motion.

The single question intended to be reserved in this motion for a new trial is, whether a grant of administration in the state of *New-York* will give a right to such administrator to commence a suit in this state, or control the personal property? For the defendant claims, that he has a right to the effects in his hands, by virtue of authority from the administrator in *New-York.* If, therefore, such administrator has no authority over the goods here, he can give none, and the defendant must be executor in his own wrong.

In *England* the king had formerly a right to all the

goods of those who died intestate. 9 *Co.* 38. 2 *Bla. Com.* 494.

And now no notice is taken of a grant of administration in a foreign country. If one dies in *France*, leaving goods in the diocese of *N.* in *England*, the bishop of *N.* must grant administration. 11 *Vin. Abr.* 73. 76. *Palm.* 163.

And in *Tourton* v. *Flower*, 3 *P. Wms.* 369. the Lord Chancellor says, our courts take no notice of what is done in the spiritual courts beyond sea; as in case of administration granted in *Paris.* 11 *Vin.* 78. 2 *Com. Dig.* 256.

The same principle is recognised in a late case in 8 *Ves.* jun. 44. And this principle applies not only to grants of administration in countries strictly foreign; but to grants in *Ireland.* 11 *Vin.* 76. *Freem.* 102. 2 *Lev.* 86.

Nor will grant of administration in *England* extend to the colonies in *America.* 2 *Atk.* 63. This is also admitted in argument in *Wright* v. *Nutt,* 1 *H. Bl.* 146. 154. And this is not the law of *England,* merely. But the principle has been recognised in almost every state in the union. In *Pennsylvania,* in the case of *Græme* v. *Harris,* 1 *Dal.* 456. it was holden, that letters of administration granted by the archbishop of *York* had no effect there.

So also have been the decisions in *North Carolina.* 1 *Hayw.* 354. In *New-York* it does not appear that the *English* law has ever been questioned; but the invariable practice is in pursuance of it.

And it is recognised as the law of *Massachusetts* in a very recent case of *The Selectmen of Boston* v. *Boylston,* 2 *Mass. Rep.* 384.

Such also have been the decisions in the courts of the *United States.* 1 *Cranch,* 268. 278. 282. And so far has this principle been extended by the *supreme court* of the *United States,* that letters of administration granted in what is now the district of *Columbia,* while it was a part of the state of *Maryland,* were holden to be invalid, after that territory was placed under the jurisdiction of the *United States. Dixon* v. *Ramsay,* 3 *Cranch,* 323.

It is objected, that the reason of the rule is local, and therefore should not be adopted here.

But such a rule existing in other states and countries is of itself a reason for our adopting it; otherwise, our citizens would be subjected to the disadvantages of the rule in other states, and the citizens of those states would derive the same benefit in this state as our own citizens. For instance, a man dying in *New-York* leaves goods in that state and in this. The administrator there draws from this state the goods here; and our citizens must go into *New-York* in pursuit of their claims. But they there find that the whole estate is absorbed by judgments and bond debts. Whereas, had the *New-York* creditors been compelled to come into this state, where no such preference exists, our simple contract creditors would have divided the estate equally with them. The state, too, in this way may lose the priority to which it is entitled; as upon this principle, instead of retaining the goods of its debtor for a debt due the state, it tamely yields those goods to the jurisdiction of another state, and consents to share equally with the creditors of that state, or even to be postponed to them.

Again : Is it reasonable that we should yield to them what they deny to us? Shall they gain both by their own rule, and by ours? And shall our citizens lose by both? Is it not the duty of a government, as well as of an individual, first to provide for those of its own household? And shall our citizens be forced to apply to a foreign government, or another state, for that justice which it is in the power of our own government to grant them;—especially when that state, or government, in similar circumstances, will not drive its citizens to go to ours for redress; but makes use of the means in its own hands for that purpose? Justice to our own citizens requires that a principle of reciprocity be established.

Besides, when we know that other states have adopted the *English* rule, we may fairly infer that they expect a similar rule to be adopted against them ; and therefore, when they grant administration, they do not expect that such a grant would have a greater effect than they themselves would give to a similar grant; and that they do not intend to affect the goods out of their jurisdiction. No reason can be given why our courts should give a greater extent to this grant than the court which made it would have done. But it is objected, that the decision of our own courts have been contrary to the *English* practice. They have decided in one case, that being qualified to act as executor in a foreign country would not qualify them here. *Perkins* v. *Williams*, 2 *Root*, 462. But it is admitted, that the course of decisions in this state has been, that an administrator or executor deriving his authority from *a sister state* could exercise that authority in this state.

But upon examination, it will be found, that those decisions arose, not from an intention on the part of the *courts* to alter the law of the country; but from a con-

vention entered into by the legislature with some of the other states.

In the year 1648, the commissioners of the four *United Colonies* proposed and recommended to the general courts, that if the last will of any man be duly proved and certified from any colony, it forthwith be accepted and allowed in the rest of the colonies: and that, if any known planter or settled inhabitant die intestate, administration be granted by the colony to which the deceased belonged, though he died in another; and the administration being duly testified *to be of force* for gathering in the estate in the rest of the colonies. These propositions were, by the general court of this state, adopted, in *March*, 1648, upon this condition, however—" Provided the general courts of the other colonies yield their assent thereto."(*a*)

(*a*) The act passed by the legislature of *Connecticut*, then one of the *United Colonies*, was in these words:

"*At a session of the general court in Hartford, this* 14*th March*, 1648.

" Whereas it was recommended by the commissioners, that for the more free and speedy passage of justice in each jurisdiction to all the confederates, if the last will and testament of any person be duly proved, and duly certified from any one of the colonies, it be without delay accepted, and allowed in the rest of the colonies, unless some just exception be made against such will, or the proving of it, which exception to be forthwith duly certified back to the colony where the said will was proved, that some just course may be taken to gather in and dispose of the estate without delay or damage. And also, that if any known planters or settled inhabitants die intestate, administration be granted by that colony unto which the deceased belonged, though dying in another colony; and the administration being duly certified to be of force for gathering in of the estate in the rest of the colonies, as in the case of wills proved, where no just exception is returned: But if any person possessed of any estate, who is neither planter, nor settled inhabitant, in any of the colonies, die intestate, the administration, if just cause be found to give administration, be granted by that colony where the person shall die and depart this life, and that care be taken by that government to gather and secure the estate, until it be demanded, and may be

From this convention, thus early entered into, we may fairly infer, that our ancestors considered the law of *England* upon this subject as binding upon them, until altered by the legislatures. And it is, therefore, by their opinion now in force, except where it has been thus altered: that they were careful not to change this law, except as to the citizens of those states that also made this change, and adopted the recommendation of the commissioners: and, consequently, that the principle of reciprocity, for which we contend, was in part established by the wisdom of our ancestors. And until it is shown that the state of *New-York* has adopted this convention; the very terms upon which the legislature of this state adopted these propositions prove, that the citizens of that state are not entitled to the benefit of them.

In point of practice, it is admitted, that this distinction has not been kept up, by our courts; but this has happened, it is presumed, from this circumstance, that the practice under this convention having been long gone into, and our courts having become familiarized to the idea of administrators appointed by other states bringing suits in our courts, the law which authorized it was forgotten, and it was considered as a general principle, that administrators from other states could bring suits in this. That this was the fact is evident from this, that in no case reported upon this subject decided by our courts, is this convention alluded to.

When, therefore, it appears, that these decisions of our courts are directly opposed to the letter and spirit

delivered according to rules of justice. Which, upon due consideration, was confirmed by this court, in behalf of this colony, and ordered to be attended in all such occasions for the future: provided the general courts of the other colonies yield the like assent thereunto." See 2 *Haz. Hist. Coll.* 124. 135.

of the act of the legislature, it is presumed that they will not be regarded as precedents in this court. But these decisions, it should be noticed, were as between the administrator and the debtor; but this case is between the foreign administrator and the creditors of the intestate.

It is said, that one man may constitute an attorney, who may act for him as well in one state as another. This is admitted as to the property of the principal; but in this case, it is contended, that the principal, the administrator, has no interest in the property, which is out of his jurisdiction.

It is objected, that the decision contended for by the plaintiff is in violation of the constitution of the *United States*. It is a sufficient answer to this objection, that the *supreme court* of the *United States*, the peculiar guardian of the constitution, did not think such a decision as at all impugning that clause of the constitution.

But it is said, that the assignees of a bankrupt appointed in one country, may maintain an action in any other country. Lord *Kaimes*, however, says, that statutory transfers of property to assignees of a bankrupt, do not carry effects in *Scotland*. 1 *H. Bl.* 677.

And Chief Justice *Kent*, whose researches have been as great as those of any man in this country, says, that assignees of a bankrupt cannot sustain an action in their *own* name in *Great Britain*. 2 *Johns.* 344.

It is admitted, indeed, that *courts of chancery* have, in certain cases, interfered to protect the rights of assignees of bankrupts. *Solomons* v. *Ross*, cited 1 *H. Bl.* 132.

VOL. III.                        M

In *Cleve* v. *Mills*, cited 1 *H. Bl.* 680. Lord *Mansfield* says, the statutes of bankrupts do not extend to the colonies.

But if, as between the assignee and debtor of the bankrupt, the court would permit the assignee to sustain a suit, and would say, that it does not lie in the mouth of the debtor to object; would they therefore say, that as between creditors of a bankrupt, one of which claimed under the laws of a foreign country, by the title of the assignee, and the other was claiming under the laws of our own country, by virtue of an attachment, that the former must prevail? Are the court prepared to say, that if an *English* merchant has goods in this country, and owes debts here, and becomes a bankrupt, that the assignees may recover these goods, though attached by our own citizens; and that our citizens must cross the *Atlantic* in pursuit of them? This very case is mentioned in argument in *Hunter* v. *Potts*, 4 *Term Rep.* 190. and as what could not be expected.

The discharge of a bankrupt in *Maryland*, has been held not to operate upon his *English* creditors. *Smith* v. *Buchanan*, 1 *East*, 11.

The same point was decided in *New-York*, in the case of *Van Raugh* v. *Van Arsdaln*, 3 *Caines*, 154., and in this state, in the case of *Buell* v. *Shethar*, in *Litchfield county*. MS. And why the assignment should operate upon creditors who would not be affected by the discharge, seems unaccountable.

That the *English* law is in our favour is admitted. It must also be admitted, that this is considered law in the highest courts of our own country; that it was considered as law by our own legislature, at an early period of our country; and that this case is not within the

alteration then made. This principle, moreover, accords with the general principles of law; and its adoption becomes necessary for the security of our citizens. The disavowing of former decisions upon this subject can shake no titles to estates, and destroy no securities for debts. Nor does any reason exist, why the law should not be restored to what it anciently was; and the principle of reciprocity alluded to in the convention of 1648, be again established.

*Dunbar* and *J. Trumbull*, contra.

*Moses Deming*, of *Connecticut*, being indebted to *Justus Riley*, removes to the state of *New-York*, and dies. *Jedediah Sanger* of *New-York* there obtains letters of administration on *Deming's* estate. *Roger Riley*, the defendant in this state, has received of the goods, &c. of *Deming* under an apparent authority from the administrator. The question arising upon these facts is, whether the administrator did or could convey any such authority to the defendant; and whether he is not executor in his own wrong? If the administrator had right to have come into *Connecticut* and to have possessed himself of this estate, he doubtless might have authorized the defendant. To decide the question whether he could do so or not, we must consider whether, in case of refusal to deliver, he could have maintained an action in character of administrator. That the laws of *England*, and some of the states in the union, do not allow an administrator, deriving his authority from the appointment of a court of foreign jurisdiction, to sue in their courts will be conceded; but that the law, or the reason of the law, in this state, is so, will be denied.

The right of granting administration is regarded by the *English* law as merely a matter of favour; and the reason why a foreign administrator cannot sue in *En-*

*gland* is, not because of any defect or inefficiency in his character as such, but because it would affect the rights of third persons. The original of administrations, according to the *English* law, may be found in 2 *Bl. Com.* 494., and in *Hale's* and *Reeve's History of the English Law*.

The administration of intestate estates was very anciently performed by the king in person; or rather, he took to himself all the estate of those who died in this manner. Afterwards, and in favour of the church, as it is said, this privilege was granted by him to the reverend prelates; surely, not because the public good required it, but as a privilege, and for their private emolument, without their being even liable for the payment of debts. While this remained the law of *England*, the reason is obvious, why strangers were not allowed to sue in behalf of the estate of the intestate: it was, that the rights of this ecclesiastic would be affected, for he, in fact, succeeded to the possession, even in exclusion of creditors. Thus the law continued until the statute of *Westminster* 2. ordained, that the ordinary should be bound to pay the debts of the deceased; still, however, the remainder of the estate, if any, belonged to the ordinary, to be applied by him according to his conscience, or, *in pios usus;* yet, it will be remarked, that these " *pios usus*" were such as the ordinary chose to regard, and for the discharge of his duty in this respect he was accountable to no one. There is no reason, therefore, to say, that the estate did not absolutely belong to him. In the 31st of *Edward* III. the abuses of this authority had become so outrageous and insupportable, that by statute it was directed that the ordinary, instead of administering himself, should appoint the nearest and most lawful friends of the deceased. This was, indeed, a most deadly stroke to his power in this respect; but what remained was not as a new grant,

but only the residue of his former privilege. Thus arose the law of administrations in *England;* and so it still remains, except with some few minor alterations introduced by subsequent statutes. And hence it will appear, that the reason why the deceased could never be represented by an administrator deriving his authority from any other source, was not, that he would otherwise be incapable, but because it infringed upon this privilege of the ordinary, or metropolitan, as the case might be. And this idea is still further enforced from the recollection, that if the deceased had estate in more dioceses than one, the granting of administration belonged not to the ordinary, but to the archbishop of *Canterbury* or *York.* From whence we learn, that not only a foreign administrator could not sue, but even a native residing in *England* could not do this, except he derived his authority from those to whom it had been graciously granted, and who had carved it up to their own liking.

A further argument in support of this position may be derived from the circumstance, that an assignee under a commission of bankruptcy may sue, as such, in a foreign country, for debts due the bankrupt. *Le Chevalier* v. *Lynch, Doug.* 170. 2 *Com. Dig.* 27. Now, an assignee, by the assignment from the commissioners, is no more completely invested with all the estate of the bankrupt, and all the rights and privileges annexed thereto, than this administrator; and if there is any reason why his power in this respect is more extensive, it must be because he represents a person in life, and the administrator a person who has ceased to live; the rights of both are equally created by act of law; nor do we find in this respect any difference made between an administrator and executor. And can the assignee have an authority more extensive than an executor, who is authorized and appointed by the testator for this ex-

press purpose? The reason, therefore, why a foreign administrator cannot sue in *England* is, that it affects the privileges of the consistory or prerogative courts.

It will hardly be said, that the reason why administration is granted upon estates in *Connecticut* is, that the judge of probate may be benefited, or those who act under him. It is, that the property may be appropriated to the discharge of the debts of the deceased; and that the residue may be distributed to his legal representatives. A purpose much more *pious*, than the history of former times would induce us to believe operated upon ecclesiastics of the 12th century. The reason of the *English* law, therefore, in this instance, does not apply to the laws of *Connecticut*.

But it is objected, that the citizens of *Connecticut*, after having given credit upon the strength of property in this state, ought not to be driven into any other, to obtain payment of their just claims. We think we shall be able to show, that this will be unnecessary; because, if there be estate in *Connecticut*, it may be attached; at least, we see no reason to the contrary. It is true, the law does not permit the body of an executor or administrator to be attached, or imprisoned; and the reason is, that the debt is not his, nor is he under any personal liability to respond. This reason, however, extends no further; and on that ground, we contend, that the law extends no further. *English* precedents to this point cannot be found; but, in the commonwealth of *Massachusetts*, the practice is according to our proposition. *Precedents of Declarations*, 90. The writ directs, that the estate, &c. of the deceased be attached, and that notice, &c. be given to the administrator. By this means, the creditor is secured, and the rights of the administrator remain unviolated. We are sensible, that this has not been the practice in *Connecticut*; but, we see no

reason why it may not be, if the necessity of the case requires it; for the attachment of estate is considered as giving our courts jurisdiction. If it should be said, that the laws of *Connecticut* providing for the settlement of insolvent estates are repugnant to this doctrine, we answer, that those laws can never operate, unless administration be granted in this state, and then the case will be totally variant from the present; and if such be the laws of other states, which, however, does not appear, yet it will not affect our present question, because, the attachment here by a creditor who has not proved his debt under the foreign administration, will take precedence of any claim afterwards made by such administrator. This has been decided in the case of assignees in *Connnecticut*, *Kirby*, 313.; and in *England* by Lord *Mansfield*, *Doug.* 170. But if we are incorrect in this position, we have still another answer, viz., that a court of chancery may interpose, and that the existence of estate in *Connecticut* will give jurisdiction. And if in either of these ways remedy may be had, the objection fails.

And here we will inquire, if the deceased in his lifetime might have sued in this state for debts due him, why it is, that his executor who is by him appointed for this express purpose may not? The executor or administrator stands, to all intents, in the state of the deceased, except their bodies are not liable to arrest; and they are as fully empowered to do every thing in relation to the estate as an attorney can in any case be, or as an assignee under commission of bankruptcy. Indeed, the estate of the deceased may, in such case, be considered as the real party.

If, then, the reason of the *English* law does not apply, will the court find themselves bound by precedent?

In the case of *Nicole* v. *Mumford*, *Kirby*, 270., it is said, that an administrator being appointed in the state where the deceased dwelt, may in this state sue for the recovery of any property belonging to the deceased. The administrator in that case dwelt in *New-York* like the present. In the case of *Woodhull, &c.* v. *Gleason & Cowles*, in the *supreme court*, this doctrine was acknowledged; and the court will bear witness, that this has been the constant invariable practice in *Connecticut* for a long course of years: and although it is shown, that this law arose from, or perhaps rather was confirmed by, a convention between the *New England* states, yet in our practice, no difference can be shown between them and others. And so far from its proving to the contrary, it not only shows this to be the law of *Connecticut*, but that it has immemorially been so; and that without any evil consequences resulting.

The counsel for the defendant also relied upon the provision in the *Constitution of the United States*, that full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state. *Art.* 4. *s.* 1.

BY THE COURT, unanimously. By the common law, the power and right of an administrator are given only by the court that appoints him. The power of an executor is given by the will of the testator; but his right to appear in any court, and the validity of his acts in that capacity, depend wholly on the probation of the will by the prerogative court, within the limits of that local jurisdiction, in which he claims the power to act.

In *England*, a will must be approved in every prerogative court, within the local limits of whose jurisdiction the testator died possessed of *bona notabilia*, in

order to enable the executor to take possession of the goods.

The courts of probate in *Connecticut* have, as to this point, a jurisdiction co-extensive with the limits of the state, and no more.

During the union of the four original colonies of *New England*, in 1648, it was proposed by the board of commissioners, that " if the last will and testament of any man be duly proved and certified from any one of the colonies, it shall be accepted and allowed in the rest; that if any planter or inhabitant die intestate, administration be granted by the colony to which he belonged, and the administration shall be in force for the gathering in the estate in the rest of the colonies." This proposition was approved and confirmed by the statutes of those colonies, and continued to be law, as long as those statutes remained in force. The statute of *Connecticut* was not repealed on the dissolution of the union, but was omitted in a subsequent revision of our laws. Still the practice has continued to allow, in our courts, the right of action to executors and administrators, empowered by the courts of the neighbouring states, and to consider all their acts in such capacity valid. This practice is not warranted by common law, or by any existing statute. It rests only on ancient custom; justified by convenience and reciprocity, so long as the neighbouring states allowed the same rights to executors and administrators, empowered by the prerogative courts of this state. The right is refused in the state of *New-York*. It has recently been denied in the *supreme judicial court* of *Massachusetts*.(a)

New trial to be granted.

(a) See the case of *Goodwin* v. *Jones*, in 3 *Mass. Rep.* 514.