THE SOUTH-WESTERN RAILROAD COMPANY, plaintiff in error, vs. ELIZABETH PAULK, administratrix, defendant in error.

[1.] Corporations are embraced in a statute, under the designation of *persons*, unless expressly excepted, or excluded by necessary implication on the ground of the total inapplicability, of the statute, as to the subject matter, to them.

[2.] Neither a corporation nor an individual, have a vested right to do wrong; none such can be conferred.

[3.] In a suit for damages, for the killing of a person by a railroad, under the Act of 1850, the action should be brought in the county where the principal office of the corporation is kept.

[4.] The fourth section of the Act of 1856, being *in futuro* only, does not repeal by implication, the Act of 1850; or in other words, take away a cause of action which originated in 1855, prior to its passage.

[5.] If through the default of the corporation or its servants, the passenger is placed in such a perilous condition as to render it an act of reasonable pre-

caution, for the purpose of self-preservation, to leap from the cars, the company is responsible for the injury he receives thereby; although if he had remained in the cars, he would not have been injured.

[6.] The question of damages considered.

[7.] It is a general and well settled doctrine, recognized both in England and America, that no suit can be maintained or brought by any executor or administrator, in his official capacity, in the Courts of any other country, except that from which he derives his authority.

To authorize a foreign administratrix to sue in this State, under the Act of 1850, (*Cobb* 341,) the intestate must have departed this life out of this State.

New trial from Taylor county. Tried before Judge Wor-rill, October Term, 1857.

This was an action brought in Taylor Superior Court by Elizabeth Paulk, as administratrix of Uriah Paulk, deceased, against the South-Western Railroad Company, to recover damages for killing the said Uriah by the cars on the said railroad, at Butler, in Taylor county, on the 29th day of December, 1855. The letters of administration were granted to plaintiff by the Orphan's Court of Macon county, in the State of Alabama.

The defendant filed a plea to the jurisdiction of the Court on the ground that the suit should have been brought in the county of Bibb, where defendant kept its principal office, and not in the county of Taylor. This plea was over-ruled by the Court, and the defendant excepted.

The jury having been empannelled, the defendant demur-red to the declaration, on the ground that Uriah Paulk, the plaintiff's intestate, died within the limits of the State of Georgia, and county of Taylor, and not in a foreign State, and consequently, under the Act of 1850, the action could not be sustained by a foreign administrator. This demurrer the Court overruled and defendant excepted.

The defendant then moved the Court to dismiss the action on the ground that it was brought by Elizabeth Paulk, administratrix of Uriah Paulk, deceased, instead of by the widow of said Uriah Paulk, it having been admitted that said Uriah

Paulk died leaving a widow surviving him; which motion the Court overruled, and defendant excepted.

## Brief of evidence.

The plaintiff then offered in evidence an exemplification of her appointment as administratrix of Uriah Paulk, deceased, not including the letters of administration.  To the admission of this, the defendant objected.  The Court overruling the objection, admitted the same as evidence, and the defendant excepted.

*Charles Phelps,* testified: That he was the conductor of the train running from Macon to Columbus, at the time of the collision on the 29th of December, 1855, when Uriah Paulk was killed.  The collision was caused by both trains being out of time.

*Riley Peacock,* testified: That he was with the deceased in the train when the collision occurred.  Understood from the agent at Reynold's depot that the train he was on was running out of time.  The conductor was looking out ahead all the time, and on seeing the other train coming, hallowed to the passengers to jump off, and jumped off the train just before the collision occured.  Uriah Paulk sat nearest the door at the back end of the car and rose and went out, and either jumped or fell off the car just before the collision occurred, and the train ran back over him.  There was a general rush to the door at the back end of the car, but deceased was the only man that succeeded in getting out, as the door shut to and was so crowded by the passengers that it could not be opened.

*B. F. Newsome,* testified: That he was called professionally after the accident to see Paulk.  Witness described the injuries received by Paulk, and stated that he died from them.

*Patrick Calhoun,* testified: That he was acquainted with Uriah Paulk in his lifetime; was traveling in the same train with him at the time of the accident.  Paulk was a man

that drank some, but had not taken more than two or three drinks on the day of the trip referred to; and was perfectly at himself on that day.

*Thomas Livingston,* testified: That Uriah Paulk married his daughter. Paulk was a man of good character and worth about $25,000 at the time of his death, and left a wife and six children. He was a man of good capacity to acquire property.

*Thomas Gates,* testified: That he was a passenger on the train with deceased, at the time of the accident. Some one exclaimed, "jump out." When the exclamation was made no one countermanded the order. Witness did not recognize the voice of the person giving the order, as that of the conductor. After the collision, witness found the conductor and engineer off the train, and the engineer told him that he jumped off just before the colision, and left his engine reversed.

*Winston, and Abbott,* testified: That they were officers of the Mutual Life Insurance Company of New York, being the President and Secretary of the company—produced a pamphlet containing tables showing the terms on which risks are taken by the company. If a man is forty-two years old and in good health, so that the company would insure his life, the payment of $441 54, would secure his family $1,000; or the payment of an annual premium of $34 05, would secure the same sum. Knew of no money value for the deprivation of a husband and father.

*W. C. Bandy,* testified: That some person directed the passengers to leap from the cars; was of opinion that it was not the conductor. Is confident that Paulk would have jumped off even if no one had told him to do so, as he had previously stated his intention to do so, if there was any danger.

*James Tune,* stated: That Uriah Paulk was a very immoral man and intemperate. Was a good farmer and with a good capacity to manage his farm.

*Allen G. Bass,* testified : That the character of Uriah Paulk for morality and sobriety was not good. Does not consider he was worth more than $400 per year to his family. His character as a farmer was good.

*Ralph O. Howard,* testified: That Uriah Paulk's character for morality was not good; he was a man who used liquor very extravagantly. His services were worth $250 per year to his family.

*R. M. Pitts,* testified: That Uriah Paulk was a man of bad morals, and was a constant drinker, and gambler. Supposes he was worth to his family as much as an overseer. He was a good farmer and manager on his plantation.

*Asa Marshall,* testified: That he was well acquainted with Uriah Paulk and had known him from a child. He was a thrifty man and his morals and character were good. At the time of his death his services were worth to his family $1,500 to $2,000.

*Daniel Royal,* testified : That he knew Uriah Paulk. He was an industrious money making man. His services in the superintending and management of his affairs was worth from $1,500 to $2,000.

The Court then, (among other things) charged the jury, " that the plaintiff as foreign administratrix had a right to sue in this action upon the cause set forth in the declaration."

To this charge the defendant excepted.

The Court further charged, "That in case of collisions of trains, a passenger seeing such collision about to take place was not in fault in jumping off the train, especially if the jury should believe that an order to do so was given by the conductor or other employee of the company on the train."

To which charge the defendant excepted.

The jury found for the plaintiff $12,000, and costs.

Defendant moved for a new trial on the following grounds:

1st. That the Court erred in overruling defendant's plea to the jurisdiction.

2d. That the Court erred in overruling the motion of defendant to dismiss said action on the ground, that Uriah Paulk, plaintiff's intestate, died within the limits of the State of Georgia, and in the county of Taylor, as appears upon the face of the declaration.

3d. That the Court erred in ruling that the action was properly brought by the administratrix of Uriah Paulk, instead of by the widow of said Paulk.

4th. That the Court erred in admitting the exemplification of the appointment of Elizabeth Paulk as administratrix, there being no letters of administration produced.

5th. That the Court erred in ruling that the plaintiff had a right as foreign administratrix to sue in this action upon the cause set forth in the declaration.

6th. That the damages assessed by the jury were excessive.

7th. That the verdict was contrary to law.

8th. That the verdict was contrary to evidence.

9th. That the Court erred in charging the jury that "in case of collision of trains, a passenger seeing such collision about to take place, was not in fault for jumping off the train, especially if the jury should believe that an order to do so was given by the conductor or other employee of the company on the train."

The motion for a new trial was refused, and defendant excepted.

Poe & Grier; and Gordon, for plaintiff in error.

Stubbs & Hill; and C. J. Williams, *contra.*

*By the Court.*—LUMPKIN, J. delivering the opinion.

This is an action for damages, against the South Western R. R. Company, for having destroyed the life of defendant in error's intestate, while a passenger on plaintiff in error's train, in the county of Taylor, in December, 1855.

[1.] The right of action is claimed by virtue of the Act of 1850. It is not pretended that it existed at common law. That Act provides that, "In all cases thereafter, where death shall ensue from or under circumstances which would have entitled the deceased, if death had not ensued, to an action against the perpetrator of the injury, the legal representative of such deceased shall be entitled to have and maintain an action at law against the person committing the act from which the death has resulted; one-half of the money to be paid to the wife and children, or to the husband of the deceased, if any, in case of his or her estate being insolvent." (*Cobb,* 476.)

Counsel for the Company insists, 1st. That this act does not embrace Railroads; and 2dly. That if it does, it impairs the obligation of the contract between the corporation and the people of the State, which was entered into five years before the act of 1850 was passed; and was therefore void.

Railroad Companies are not expressly included or excluded by the words of the act. The terms used are, "perpetrators of the injury," and " persons committing the act." Now the well settled rule of construction is, that corporations are embraced in the words of a statute under the designation of persons, unless expressly excepted or excluded by necessary implication, on the ground of the total inapplicability of the statute, as to the subject matter, to them. (8 *Peters' Rep.* 426; 11 *Wheaton,* 412; 16 *Curtis,* 643; 6 *Peters',* 29; 12 *Peters',* 134; *Dwarris,* 478, 476, 655.) Tested by these rules, it is clear that the act of 1850 extends to and embraces R. R. Corporations. The word *person,* both in civil and penal statutes, applies to *artificial,* as well as *natural*

persons. And Railroads, to say the least of them, are quite as capable and likely to kill, or to use the language of the statute, " to perpetrate the injury," or " commit the act" here complained of, as individuals.

[2.] As to the constitutional competency of the legislature to pass the act, there cannot be a shadow of doubt: neither a corporation nor a citizen can have a vested right to do wrong; to take human life intentionally or negligently. To prevent so serious an evil, the General Assembly may compel the wrong-doer, whether private or corporate, to make pecuniary compensation. The act is general; applicable alike to all, and making no odious discriminations against railroads. The legislature might make a reckless destruction of life like this a capital felony on the part of the employees of the road, *if it be not one already.* And for myself I believe it would, as a preventive, be better to do this than to treat human life as stock, to be paid for in money.

When subscriptions were made to the stock of this road it must be presumed to have been done with a full knowledge that the legislature had this power.

[3.] It is contended that the Court erred in sustaining the jurisdiction of Taylor county over this cause. For the defendant in error it is argued, that at common law corporations had residence wherever they held real estate; and that consequently a suit anywhere, at or between the termini of the road, is subject to no constitutional objection. And that in cases like this, it is no hardship. That while a corporation has an extended area for action and the transaction of business, the area for redress should be equally extensive.

This doctrine, in England, is true, for certain purposes and to a limited extent. For the purposes of taxation, building bridges, &c., corporations who own real estate in any county, will be included under the words, " inhabitant of the county," &c. And be liable there to all the litigations incident to such statutes. (*Central R. R. Co. vs. Davis,* 17 *Ga. Rep.* 323, *and cases there cited.*) Still, notwithstanding corpora-

tions, such as this, did not exist in this State when the Constitution was adopted, locating the trial of causes in the county of the defendant's residence, we are of the opinion that except in those cases where recent acts have enlarged the jurisdiction, that suits should be brought in the county where the principal office of the corporation is kept; and in the present case, in Bibb county—the city of Macon in that county being the place where its principal office is kept. Nor do we consider this case saved by the act of 1856. (*Pamphlet*, 155.) This Act gives the right to sue in any county in which the cause of action originated, *only* to him whose person or property has been injured. Neither the person or property of Elizabeth Paulk, administratrix, &c., has been injured by the running of the cars of the S. W. R. R. Company. The first section of this act, as to jurisdiction, is retrospective, as well as prospective; but the 4th section is future only, as to the cause of action. We do not intend to say, that had this cause of action come under the act of 1856, as it clearly does not, instead of the act of 1850, the question as to jurisdiction might not be decided differently. Some reasons exist why this class of cases should be tried in the county where the killing took place, as well as injuries of an inferior grade. The reasons however are not so strong in the former as in the latter. In any event the right is permissive only, and not restricted. And perhaps it would be safer, all things considered, to renew this suit at least in the county proper of the residence of the corporation.

[4.] Both sides agree that this action is brought under the Act of 1850. It is insisted on the part of the plaintiff in error that that Act is repealed by the Act of 1856; which although it does not repeal the Act of 1850, *eo nomine*, does repeal all laws in conflict with it; and that the right in this case, not having been consummated by judgment, is gone.

Is the Act of 1850 in conflict with the Act of 1856? We think not, and for the reason already intimated, in considering the question of jurisdiction. The 4th section of the Act

of 1856 applies only to causes of action originating after its passage. Its terms are, " if any one *shall be* killed," &c., (*Pamphlet, p.* 155.) It does not retroact so as to take away rights which had accrued in December, 1855, prior to its passage. The Act of 1850 is of force until the Act of 1856 goes into operation. Until then, there is no conflict between them, and therefore no repeal by implication.

[5.] Did the Court err in charging the jury that it was the right of a passenger to jump, in case of the collision of trains, especially as both the engineer and conductor did so; and the order to jump was given by the conductor, or one of the agents of the Company, occupying the conductor's place, after he had left the train.

That death ensued in this case from the gross misconduct of the conductor is indisputable. Candor constrained the counsel for the road to make this concession; it is unnecessary therefore to enter into a minute investigation of the question of diligence, &c. Against the doctrine contained in the charge, however, the case of *Collins against the Albany and Schenectady R. R. Company,* (12 *Barbour's Rep.* 492,) has been cited. Upon examination it will be found that it does not sustain the contrary proposition. The injury in the New York case was occasioned by the defendant's leaving his seat and going upon the platform, " as if to go out," when the collision was about to take place. "The jury fixing their attention," as the Court said, " upon what seemed to them the more immediate cause of the disaster, found as a fact in the case, that the plaintiff was entirely free from negligence." And then Judge Harris adds, " And perhaps, after all, the jury were right in their conclusion, that the mere fact of leaving his seat and going to the platform, under the circumstances, did not amount to negligence on the part of the plaintiff." *A multo fortiori*, did it not in this case.

But the opposite principle from that contended for by the able counsel for the plaintiff in error is abundantly fortified by authority. (13 *Peters' Rep.* 181 ; 13 *Curtis*, 115 ;

*Pierce on American R. R. Law,* 475 *; and* 23 *Penn. State Rep.* 147.)

In the case of *Stokes vs. Saltenstall, cited from* 13 *Peters',* the Circuit Court charged, and the Supreme Court affirmed, the instructions as law, that "if the want of proper care or skill of the driver of a stage coach, placed the passengers in a state of peril, and they had at that time a reasonable ground for supposing that the stage would upset, or that the driver was incapable of managing his horses, the plaintiff is entitled to recover, although the jury may believe, from the position in which the stage was placed by the negligence of the driver, the attempt of the plaintiff, or his wife, to escape, may have increased the peril, or even caused the stage to upset; and although they may also find, that the plaintiff and his wife would probably have sustained little or no injury, if they had remained in the stage."

Mr. Pierce states the rule thus: "If through the default of the Company, or of its servants, the passenger is placed in such a perilous condition as to render it an act of reasonable precaution, for the purpose of self-preservation, to leap from the cars, the Company is responsible for the injury he receives thereby, although if he had remained in the cars he would not have been injured." And the author cites, in addition to the cases already quoted, 9 *Metcalf,* 1 *;* 15 *Illinois,* 468, 471 *;* 17 *Ib.* 509 *;* 1 *Sandford,* 89.

[6.] Another main question in this case is, were the damages excessive ?

It is admitted that in actions of this sort, the jury cannot find vindictive, punitive, or exemplary damages ; and that they are confined to injuries of which a pecuniary estimate can be made ; and that they cannot take into consideration the mental sufferings occasioned to survivors, by the death. Such has been the uniform construction put by the British Courts upon the 9 *and* 10 *Victoria Ch.* 93, which is almost identical with the act of 1850. (12 *Eng. L. and E. Rep.* 437 *;* 2 *Eng. C. L. Rep.* 578.)

The S. W. Railroad vs. Paulk.

Conceding, then, that the verdict is to be confined to pecuniary damages, and that nothing is to be given by way of *solatium*, still there is great difficulty in establishing a proper basis for assessing damages. It would seem that when the proof shows the yearly income or worth of the deceased, and you fix the average duration or expectation of human life, you have two data by which to solve, with some approximation to accuracy, this vexed problem. The proof of the value of the service of the deceased, varies in this case, from $250 to $2,000 per annum. By *Dr. Wigglesworth's Tables, with Mr. Ingersoll Bowditch's corrections, published in the 11th volume of the American Jurist, pages* 492–3–4, the average duration of the life of a man aged 45, is 23.92 years. By the *Northampton Tables,* it is 20.52, and by the *Carlisle,* 24.46. In this State, we are inclined to think that 20 years would be a fair average number, as many tables in the United States go as low as 18 years. These tables embody the law of average. Upon them the rates of life insurance are framed. Upon them an insurance company will insure the life of a "*substantious*" man, as he is called in the Scotch law, 45 years old, to the amount of $1,000, upon the payment of $469 03 cash.

In ascertaining what shall be this cash payment, another consideration in addition to the law of average is be observed, to-wit: The value in interest of the use and interest of the $469 03, which, as it increases, balances any exceptional breaches of the law of average. For example: invested at 10 per cent., and experience shows that cash invested in life insurance companies readily realizes that amount—the sum of $469 03, compounded every year, will amount to upwards of $1,000, the sum insured, in seven years. Therefore, at the end of seven years, the company will not suffer by the death of the individual; and will reap clear profit every day after that time. Their risk, therefore, is not on the average duration alone of human life, but conjointly with the increasing value of a specific sum of money.

If the law of average says a man will live twenty years, they are willing to risk his life seven out of the twenty. For to secure $1.000, they require the cash payment of a sum which, compounded, shall yield $1,000 in seven, and not in 20 years. If, then, $469 03 would secure $1,000, fifteen times $469 03, or $7,038 35, would secure $15,000, which, at 7 per cent., would yield an annual income of $1,050, about the average value of the annual services of the deceased, according to the testimony. It may be argued, therefore, that $7,038 35, and not $12,000, as found by the jury, was the actual marketable value of the life destroyed in this case.

We are not satisfied, however, with this rule of computation. For it is based upon the idea of a large profit resulting to the insurance company; their calculations, while professedly founded upon the idea of 20 years duration of life, is, in point of fact, staked upon the risk of 7 years only. Besides, the party is killed, and an estimate, applicable only to the living—whose lives may actually be insured—cannot fairly and legitimately be predicated of the dead; still, we do not absolutely reject it.

Taking 20 years, again, as the average of human life, what is the present value of an annuity of $1,000 upon such a life? $10,594. (See *Encyclopædia Brit. Title, Annuity.*) If the annual value of his life was $500, then the present worth would be half that sum. If $750, then three-fourths the amount

I have made no allusion in this latter calculation, to the yearly expenses of the party, which is ordinarily to be deducted from the annual income.

It may be objected to this rule, that whatever may be adopted as the *present* value of one's services, it offers no security for the future. They may, hereafter, yea, the very next year, be worth a great deal more or a great deal less. He may become a cripple; helpless, and earning nothing thereafter, the remainder of his life. That by change of circum-

stances, his means of success may be doubled, and the fruits of his labor immensely increased. He may, on the other hand, be now sober. and soon become an inebriate; or a drunkard, and immediately reform. Shall the present, then, determine arbitrarily the future?

The best reply to all this, is, the uncertainty of all sublunary things. One kills your slave; you recover of him a thousand dollars. Had he been let alone, he might have died of disease in less than a month's time after his life was taken. You buy or sell a slave at $1,000: he is sound, but is killed by the falling of a tree, or of apoplexy, the next day. The loss has to be submitted to. This objection is rather specious than substantial.

In any view of the question of damages, something is due, independent of income, for the loss of the care, protection and assistance of the husband and father. Indeed, there are so many elements entering into the account, that in whatever light we look at the subject, we become perplexed in the attempt to pursue it. There must be some latitude left to the soundness of the discretion of the jury, over the subject, as a question of fact. And the greatest, if not the only protection against the abuse of this discretion, must be found in the stern determination of the Courts, not to allow a verdict to stand, which bears the impress upon its face, of passion, partiality, or prejudice.

Look at the persons who compose the passengers upon a railroad train, and who are smashed up by one of these disasters. See the variety of ages, sexes, conditions, avocations of the crowd; doctors of divinity and of medicine, judges and lawyers, planters, merchants, mechanics, manufacturers, bankers, teachers, men, women and children: to apply a uniform rule, by which to compensate for the life of each, would require more than the wisdom of Solomon in all his glory. But we dismiss the subject, at least for the present.

[7.] There remains but one more point to be considered, and that is, whether this action can be maintained by the plaintiff, under the letters granted to her in Alabama. That depends upon the Act of 1850. The preamble recites, that "whereas, it frequently happens that persons depart this life in another State, owning judgments, bonds, mortgages, and other specialties, and promissory notes, and bills of exchange, and other evidences of debt, and divers causes of action against citizens of this State," &c.

"Sec. 1. For remedy whereof, be it enacted, That from and after the passage of this Act, it shall and may be lawful for any administrator or administrators, and administratrix, for any executor or executors, and executrix, or guardian, of any deceased person or persons who may have departed this life *in another State*, and a citizen or citizens of such other State, at the time of their decease, owning at said time any judgments," &c. *Cobb*, 341.

Passing by the criticism that Mr. Paulk had no cause of action in this State, nor any other, for the loss of his own life, at the time of his decease, it is clear, that to entitle a foreign administratrix to sue in her representative character, in this State, her intestate must have departed this life in Alabama, or another State than Georgia, and been a citizen thereof at the time of his death. In this case, the declaration shows upon its face, that the intestate died in Taylor county, in this State, when the proof shows, that he was a citizen of Alabama at the time he was killed.

It is insisted that the rule which excludes foreign trustees, is a mere technical regulation, and should be disregarded, especially as between the several States of the American Union.

It is a general doctrine of the common law, recognized both in England and America, that no suit can be maintained or brought by any executor or administrator, in his official capacity, in the Courts of any other country except that from which he derives his authority. The authorities upon this point are exceedingly numerous and conclusive. *3 P. Wms,*

The S. W. Railroad vs. Paulk.

369; 2 *Ves.* 35; 1 *Rice,* 179; *Ambler,* 416; 2 *Mad. Rep.* 101; 1 *Cranch,* 259; 9 *Wheaton,* 505; 15 *Peters,* 1; 1 *New Hamp.* 291; 4 *Rand.* 158; 2 *Gill and Johns.* 493; 5 *Greenleaf,* 261; 11 *Mass.* 256, 313; 20 *Martin,* 232; 3 *Day,* 74, 303; 4 *Mason,* 16, 32; 20 *Johns.* 229, 266, *et passim.* See this point strongly stated by this Court, 5 *Ga. Rep,* 295, 296.

We fully appreciate the ingenuity of the argument submitted by Mr. Hill, upon this point. And it may be, that this case falls within the mischief intended to be provided for by the Act of 1850. Still, it is unquestionably excluded by the obvious words of the Act. Unless, then, we are prepared to legislate on this case, and to extend the Act, not only to a case not covered by it, but excluded, by all fair interpretation, this action must fail. To prevent a failure of the law, we might usurp the power proposed; but confining the Act to its terms, it embraces a large class of cases; and therefore, we can give it full operation without stretching its language. We are unwilling to do this.

The Legislature may have had a motive for restricting the Act to cases where the testator or intestate died abroad. Many Northern persons and others, coming to this State to transact business temporarily and return, die here. Many of them leave debts, more or less. In this very case the deceased was probably indebted for board, physician's bill, &c. It may have been in the mind of the Assembly, that in such cases, administration should be taken out here, and not drive domestic creditors to go abroad to collect their claims. Be this as it may, the words of the Act are so plain, that it would require no small degree of judicial boldness to disregard them.

We are unanimous, then, in reversing the judgment of the Court below, upon this ground. Nor can the writ be amended by substituting the name of the widow. The right accrued under the Act of 1850, and must be enforced under that Act, or not at all.

Judgment reversed.