D. H. BURTS, Administrator of WADE H. GORDON, deceased, plaintiff in error, *vs.* J. R. and H. M. DUNCAN, Executors of JOHN S. DUNCAN, deceased, defendants in error.

Gordon died in Mississippi, in 1839, leaving a will by which he bequeathed certain negroes to his wife during widowhood, and appointed Turner his executor, who qualified in Mississippi, in January, 1840.   On the 18th of May, 1845, the widow married Martin, and Martin took possession of the negroes and held them until the 9th of May, 1851, when he brought them clandestinely from Mississippi to Georgia, and sold them to Duncan for $1600.   In April, 1860, Burts was appointed in Georgia, administrator, with the will annexed, of Gordon, and on the 24th of April, 1860, demanded the negroes from Duncan, who refused to give them up, and suit was brought for them on the same day by Burts. *Held*, that inasmuch as Turner, the Mississippi executor, could not maintain an action in Georgia, to recover the negroes, that the statute of limitations did not begin to run against the estate of Gordon for five years from the time that Duncan took possession of the negroes, and that under the facts of the case, D. is not protected by the statute of limitations : *Held*, also, that the jury should not have found a general verdict for the defendant, even under Sec. 3023, Rev. Code, because the costs should be paid by defendant, notwithstanding the death or destruction of the property pending the litigation.

Trover.    Motion for new trial.    Decided by Judge WOR-RILL.    Chattahoochee Superior Court.    March Term, 1867.

Wade H. Gordon died in July, 1839, in Lowndes county, Mississippi, leaving a will by which a negro woman, Babe, and her child, Violet, were bequeathed to his wife, to be held by her during her natural life, or widowhood, for the purpose of aiding in raising their children till they were of lawful age, and in case she should die or marry, they were to be sold for the benefit of their children, and by which James H. Turner was appointed executor.

The widow afterwards, in May, 1845, married Samuel Martin, who took the negroes into possession, sold Violet in Mississippi, and in 1851, brought the others to Georgia, and sold them to John S. Duncan for $1,600.

In 1860, Duncan H. Burts became, in Georgia, administrator, *cum testamento annexo*, of said deceased, and sued John S. Duncan for said negroes and their hire.   The declaration

averred that said Turner, executor, (who had qualified in Mississippi) was, as such, possessed of said negroes in 1840, and afterwards, in said county of Mississippi, on the first day of October, 1845, casually lost said negroes out of his and said Georgia administrator's possession, and afterwards, in 1851, they came into the possession of defendant, who refused on demand, to give them up, &c., that they were worth so many dollars, and so many more for hire *per annum,* respectively. Pending the case, defendant died, and his executors became parties. On the trial, the following additional facts appeared:

SAMUEL MARTIN testified: that upon his said marriage, he took possession of said Babe and her children, kept them about six years, sold them to Duncan, deceased, in May, 1851, for $1,650 in cash, spent the money for his own use, and had never paid any part of it to any of Gordon's children; that said Gordon's children were six, viz: Hilliard P., William E., John P., James N., Wade H. and Isaac S.; that he kept the negroes by consent of Turner till he brought them to Georgia, in 1851, and did not consult the children about bringing them away.

MRS. MARTIN testified the same in substance, stating that though the children all lived with Martin, the negroes were taken secretly, and without the children knowing it, that the youngest of her children was born in 1839, and that Martin had never settled with Turner, nor with any of her children, for the negroes sold by him, and Turner was insolvent.

HILLIARD GORDON testified: that Martin had not settled with the said children or executor, and that he (witness) sold his interest in said slaves to Nevil Dobbs, for $80.

ISAAC S. GORDON testified: that he was a minor when this suit was commenced, and that he had sold his interest in said slaves to W. H. Montgomery.

JOHN HARVEY testified: that Martin, in 1851, sold the six negroes to Duncan, deceased, for $1650, when they would have brought in market over, if the title had been undisputed, $2,000, or $2,500, that witness told Duncan, deceased, that

he, witness, had fears about the titles, and he put their hire at from $250, to $300 *per annum.*

Matthew Revel testified as to said sale, and that the negroes, if the title was undisputed, would have sold for $2,500 or $3,000, that Duncan, deceased, and Duncan's executors, kept them till slavery was abolished, and that they were worth for hire, *per annum,* $400, and that in 1862, they were worth $6,100.

The demand and refusal were admitted. The plaintiff offered the Georgia administrator to prove that his administration was at the instance of said Turner, in order to recover said slaves and their hire, but the Court rejected this evidence.

The defendants then read Martin's bill of sale, dated 9th May, 1851, conveying to Duncan, deceased, said woman and her five children, for $1,600, and warranting the title; the interrogatories of said Wade H. Gordon, stating that his brothers, Hilliard, William and John, got part of said purchase money from Martin; John got $200 in witness' presence from Martin, Hilliard and William sold their interests to Dobbs, whom Martin paid, and witness, in 1839, sold his to Montgomery, that two of the brothers were dead, that Martin maintained all of said children till they were of age, and that he, witness, was eight years old when his mother married Martin.

Defendants further showed by the records of Mississippi, that Turner qualified as such executor in January, 1840, and in October, 1845, procured an order from the Probate Court to sell said slaves.

The defendants examined several witnesses who testified substantially that Duncan, deceased, paid Martin the value of said slaves, and that their hire was balanced by the expense of keeping them, some of them being breeding women.

It was admitted that Duncan, deceased, kept them openly, and paid taxes on them as his own.

The Court charged the jury that if Turner, executor, did not sue for said slaves within four years after Duncan, deceased, bought them, and he was guilty of no fraud, and held them as his own, Turner, and all claiming under him, were barred

by the statute of limitations, and that if Duncan, deceased, claimed title to said slaves in good faith, and they were emancipated by the government, plaintiff could not recover.

The jury found costs against the plaintiff. He moved for a new trial on the grounds that the Court erred in not allowing him to show that he administered at the instance of Turner, in charging as aforesaid, in refusing to charge, as requested, that if Duncan, deceased, was guilty of fraud, the statute of limitations would not protect him, and because the jury erred in finding that he should pay the costs.

The Court refused a new trial, and this is brought up for review.

RAMSEY, CRAWFORD & BURTS, for plaintiff in error.

RAIFORD & SAPP, for defendants in error.

WALKER, J.

By the Act of December, 1847, Cobb's Dig., p. 569, it is provided that nothing in the fifth section of the statute of limitations shall be so construed as to protect any defendant or defendants, from any action at any time, where the jury are satisfied that there has been a fraudulent removal or concealment of the property, in order to deprive the rightful owner of the possession or enjoyment of the same, any law, usage or custom to the contrary notwithstanding. This statute was in force at the time the possession of Duncan began, in 1851; and according to its provisions, Duncan could not be protected from "any action at any time" where there had been (no matter by whom) "a fraudulent removal or concealment of the property in order to deprive the rightful owner of the possession or enjoyment of the same." Do not the facts bring this case fully within the provisions of this statute? We think so.

By the 21st section of the Act of 1856, pamph., p. 235, it is provided that when the right to sue shall not accrue until after the death of any person, the time within which suit is to be brought, under the provisions of this act, shall not

begin to be computed until there is representation upon his estate: Provided, that in each of these cases (named in the section) there be representation by an executor or administrator duly qualified within five years from the death. Section 22 provides that where personal property shall be carried away or secreted, so that the party entitled to sue for the same, knows not who is in possession of it, or where it is, or against whom to bring his suit, the limitation of time in which suit, for the recovery of personal property are to be brought by the provisions of this act, shall not begin to be computed against such party until he has discovered where such property is, and who is in possession of it.   Ib.

This act went into effect the first of June, 1856, ib. 237; and this action was brought 24th April, 1860, less than four years from the time the act went into operation.   Now, by the act of 1847, Duncan was liable to suit "at any time," if there had been a fraudulent removal of the property in order to prevent the rightful owner from enjoying the same.   In such a state of facts, the statute of limitations did not begin to run.   It could not begin to run until the 1st June, 1856, and four years had not elapsed from that date until suit was commenced; and under the act of 1856, ought there not to be five years in which representation of the estate should be taken out before the statute should begin to run?   Such would seem to be a reasonable interpretation of its provisions. Secs. 2877 and 2880, Rev. Code, is in substance both the acts of 1847 and 1856.   See also Sec. 2646.   So that taking all our statutes on the subject together, we think, under the facts of this case, the defendant was not protected by the statute of limitations; and the charge of the Court on that subject was erroneous.

The defendant in error insisted that the legal title was in Turner, the executor, and not in the Georgia administrator, and therefore, the plaintiff could not recover.   Admitting the title to have been in Turner, we have shown that under the act of 1847, Duncan would not have been protected by the statute of limitations, because the property had been fraudulently removed.   But Turner could not maintain an action in

Georgia as executor, to recover these negroes. In Davis vs. Smith, 5th Ga. Rep., 295–6, this Court says: "An administrator or an executor derives his authority from his letters of administration or testamentary. As such, he has no power beyond the limits of the State by whose authority he is invested with the trust. He cannot sue, therefore, nor can he be sued in any other State. If it becomes necessary to sue in behalf of the estate which he represents, in a foreign State, he must obtain letters of administration in that State, according to the provisions of the law of that State." Citing quite a number of authorities. Again, in the S. W. R. R. Co., vs. Paulk, 24 Ga. Rep., 370, the Court says: "It is a general doctrine of the common-law, recognized both in England and America, that no suit can be maintained or brought by any executor or administrator, in his official capacity, in the courts of any other country except that from which he derives his authority. The authorities upon this point are exceedingly numerous and conclusive." Citing quite a number, and add, "See this point strongly stated by this Court, 5th Ga. Rep., 295, 296." This case was a construction of the act of 1850, Cobb's Dig., 341, and was adverse to a foreign administrator's right to sue in a case like this. The rule seems to have been changed and enlarged by the Rev. Code, Secs. 2573 and 2414.

We do not mean to decide that under the facts of this case the defendant is liable for the value of these negroes. We recognize the rule as laid down in the Code, Sec. 3023, that "The death or destruction, or material injury to the property pending the litigation, shall be no defence to a mere wrong doer. If the defendant is a *bona fide* claimant, and the injury arises from the act of God, and in no wise the result of defendant's conduct, the jury may take the same into consideration, but in no case shall such a Court cast the costs upon the plaintiff." In this case, the jury "cast the costs upon the plaintiff." Under the facts of the case, we hold that the defendant was not protected by the statute of limitations; and no other defence is shown sufficient to defeat the legal title shown in the plaintiff. If the property had been destroyed

by the act of God, the *vis major* pending the litigation, and the defendant is a *bona fide* claimant, as he seems to be, the jury may take the same into consideration, but they cannot, on this account, make the plaintiff pay the costs. I am inclined to think that a verdict finding the costs in favor of the plaintiff would have been sustained. This question is not before us now however.

Judgment reversed.